**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PENN - AIR & HYDRAULICS CORP.,** | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **No. 15-cv-01422** |
| | : | |
| | : | **(Judge Kane)** |
| **GEORGE LUTZ, et al.,** | : | |
| **Defendants** | : | |
| | : | |

**MEMORANDUM**

Before the Court is Plaintiff's motion for a temporary restraining order and for a preliminary injunction.  (Doc. No. 3.)  The motion has been briefed by Plaintiff only.  (See Doc. No. 4.)  On July 23, 2015, the Court conducted a telephone conference on the motion.  For the reasons that follow, the Court will grant the motion in part and issue a temporary restraining order.

**I.     BACKGROUND[1]**

This case concerns an alleged conspiracy between two of Plaintiff Penn-Air & Hydraulic Co.'s former employees and their new employer to steal Plaintiff's confidential information and use it to their advantage.  Plaintiff is an industrial distributor that designs and installs hydraulic, pneumatic, and electro-mechanical systems.  (Doc. No. 1 ¶ 7.)  According to Plaintiff, Defendant George Lutz, Plaintiff's then-vice-president of sales, wanted an equity stake in the company but

---

[1] The following background is taken from Plaintiff's complaint (Doc. No. 1), the attachments to the complaint (Doc. Nos. 1-1 through 1-12), the motion for a temporary restraining order and for a preliminary injunction (Doc. No. 3), and the brief in support of the motion (Doc. No. 4).  These factual allegations merely inform the Court's preliminary analysis, as Defendants have not yet had the opportunity to challenge Plaintiff's allegations.

the owners refused his request. (Id. ¶¶ 21, 26.) Consequently, Lutz, who had more access to password-protected sensitive data than nearly all of Plaintiff's employees, embarked on a program of stealing Plaintiff's information and data from company computers to eventually compete with Plaintiff. (Id. ¶¶ 21-22, 26-27.) In the course of his scheme, Plaintiff alleges that Lutz convinced his co-Defendant Mark Cardello, who was Plaintiff's "top sales engineer," to defect with Lutz. (Id. ¶¶ 23-25, 27.) According to Plaintiff, while both were still in Plaintiff's employ, Cardello and Lutz began meeting with Plaintiff's suppliers and customers in an attempt to divert business away. (Id. ¶ 27.) Lutz allegedly drafted a business plan and shared his plan with Cardello and co-Defendant Marc Pecsi. (Id.) Pecsi is a managing member of co-Defendant G3, LLC, Plaintiff's competitor to whom the departing employees allegedly defected. (Id. ¶ 34.) According to Plaintiff, all of the defendants conspired to steal and illegally use Plaintiff's sensitive information to divert business away from Plaintiff. (Id. ¶¶ 105-110.)

Plaintiff alleges that Lutz "had falsified expense reports to obtain reimbursement for personal equipment and other inappropriate expenses," and that as a result, Plaintiff terminated Lutz' employment on June 18, 2015. (Doc. No. 1 ¶ 11.) According to Plaintiff, Lutz did not immediately return all of the computers Plaintiff issued to him, most notably a tower computer, and to date Lutz has still not returned some items for which he wrongfully obtained reimbursement. (Id. ¶¶ 29-31.) On June 23, 2015, Plaintiff notified Lutz through his attorney to return the rest of the company's equipment and instructed Plaintiff to preserve all of the information on the computers without accessing the sensitive data any further. (See Doc. No. 1-1.) Lutz' attorney assured Plaintiff that the devices would be returned unaltered and that Plaintiff's sensitive data would not be accessed. (Id. ¶¶ 55-61.) Rather than returning the

computer immediately, Plaintiff alleges that Lutz installed new software that he then used to copy <u>all of the data</u> on the remaining computer before he returned it to Plaintiff.  (<u>Id.</u> ¶¶ 61-67.) After he had copied the computer's data, Plaintiff alleges that Lutz deleted the computer's history and event logs in an effort to conceal what he had done.  (<u>Id.</u> ¶¶ 68-71.)  After Lutz finally returned the computer, Plaintiff engaged computer forensic experts whose affidavits and exhibits support Plaintiff's allegations regarding Lutz' actions in copying the data from the computer. (<u>See</u> Doc. Nos. 1-9; 1-10.)  In all, Plaintiff alleges that Lutz and co-Defendants possess technical schematics, client-specific engineering specifications, supplier information and contact information, client lists, client purchase histories, inventory reports, and profit margin reports that are all Plaintiff's protected information.  (Doc. No. 4 at 16.)

## II.      DISCUSSION

Plaintiff has moved the Court for a temporary restraining order or a preliminary injunction compelling Defendants to return to Plaintiff all copies of its sensitive information and all equipment that contains Plaintiff's sensitive material.  (<u>See</u> Doc. No. 5.)  In addition, Plaintiff asks that the temporary restraining order or preliminary injunction forbid Defendants from soliciting Plaintiff's clients and suppliers and from otherwise using the sensitive information already in Defendants' possession.  (<u>Id.</u>)

A temporary restraining order is an extraordinary remedy, the "essential purpose" of which is the "preservation of the <u>status quo</u> while the merits of the cause are explored through litigation."[2]  <u>J.O. v. Orange Twp. Bd. of Educ.</u>, 287 F.3d 267, 273 (3d Cir. 2002).  Such relief is

---

[2] Because Plaintiff notified Defendants of the complaint and motion, and because the Court held a telephone conference where all parties were represented, the standards for granting a temporary restraining order and a preliminary injunction in this case are functionally the same.

within the discretion of the district court, and is only warranted when a movant can establish (1) a reasonable probability of success on the merits of the underlying action, and (2) that the movant "will be irreparably injured" without the requested injunction or restraining order.  Acierno v. New Castle Auth., 40 F.3d 645, 653 (3d Cir. 1994).  When relevant, a court will also consider the harm potentially caused to the non-moving party should the injunctive relief issue as well as the broader public interest.  Id.

### A.      Probability of success on the merits

As a movant must first establish a reasonable probability of success on the merits, the Court considers Plaintiff's allegations in light of the standards governing its substantive claims.[3] Standards governing the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa. Stat. § 5301 et seq., civil conspiracy, and  the federal Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, are discussed below.  The Court finds that Plaintiff's allegations concerning these three theories are sufficient to warrant the relief to be granted, so a discussion of Plaintiff's other legal theories is not warranted at this juncture.  The Court emphasizes that at this stage, the Court writes in a purely preliminary capacity; all findings and conclusions are provisional only pending further development of the record.

### 1.      Pennsylvania Uniform Trade Secrets Act ("PUTSA")

---

Walker v. O'Bannon, 487 F. Supp. 1151, 1153 (W.D. Pa.) aff'd, 624 F.2d 1092 (3d Cir. 1980) (citing Dilworth v. Riner, 343 F.2d 226 (5th Cir. 1965)); see also Fed.R.Civ.P. 65(a-b).

[3] Plaintiff has brought the following claims: (1) misappropriation of trade secrets in violation of the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa. Stat. § 5301 et seq.; (2) breach of the fiduciary duty of loyalty in violation of Pennsylvania common law; (3) conversion; (4) civil conspiracy; (5) violations of the federal Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; and (6) unfair competition in violation of Pennsylvania common law.  (Doc. No 1 at 24-32.) .

4

Plaintiff alleges that Lutz and Cardello misappropriated Plaintiff's trade secrets in violation of PUTSA.  To succeed on the merits of a PUTSA misappropriation claim, a plaintiff must show that the defendant "acquire[d] knowledge of another's trade secret in circumstances giving rise to a duty to maintain its confidentiality and then disclose[d] or use[d] that trade secret without the other's consent."  Bimbo Bakeries USA, Inc. v. Botticella, 613 F.3d 102, 110 (3d Cir. 2010) (citing 12 Pa. Stat. § 5302).  The statute defines "trade secret" as any information, like a customer list, a program, or a method, that (1) "derives independent economic value . . . from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use[;]" and (2) "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  12 Pa. Stat.§ 5302.

In the present case, Plaintiff alleges that Defendants appropriated information related to its clients' individual needs, its technical designs, and the workings of its business.  Plaintiff also argues that it maintains a password-protected security infrastructure to guard the secrecy of the sensitive information, and that Defendants were only able to obtain the information because of their positions with Plaintiff's management hierarchy.

Plaintiff's information appears to qualify as a trade secret, see Bimbo Bakeries, 613 F.3d at 110; Defendant Lutz and Cardello appear to have gained access to Plaintiff's information in their capacities as employees; and Defendants then appear to have begun to use Plaintiff's trade secrets for their own gain.  Following Bimbo Bakeries, Plaintiff has shown a reasonable probability of success on the merits under this theory.

### 2.      Civil conspiracy

Plaintiff has alleged that Defendants engaged an a civil conspiracy relating to the

disclosure and use of its trade secrets.  A civil conspiracy plaintiff must establish an underlying

crime or bad act and an agreement among the co-conspirators to accomplish that crime or bad

act.  Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472 (1979).  In addition, a court may

grant an injunction to prevent irreparable harm caused by an ongoing civil conspiracy, and courts

in this circuit have issued injunctions on civil conspiracy claims when the alleged underlying

unlawful act is the same sort Plaintiff alleges here.  See, e.g., Scanvec Amiable Ltd. v. Chang, 80

F. App'x 171, 178 (3d Cir. 2003) (affirming district court injunction on civil conspiracy and

unfair competition claims).

      Plaintiff's theory of civil conspiracy is that all of the defendants, including G3 through its

agents, conspired to steal and use Plaintiff's proprietary information, in violation of PUTSA.

Plaintiff has alleged that Cardello, Lutz, and Pecsi engaged in text communications with each

other to form and develop the conspiracy to appropriate Plaintiff's information, and Plaintiff

alleges that Pecsi was a senior stakeholder in G3.  In addition, Plaintiff's attachments indicate

that Pecsi, together with Lutz and Cardello, engaged in e-mail solicitations of Plaintiff's

suppliers and customers one week after Lutz left Plaintiff's employ.  (Doc. No. 1-6.)

      Based on Plaintiff's representations and supporting material, the Court finds that Plaintiff

has shown a likelihood of success on the merits on its civil conspiracy claim against Defendants,

because, as discussed above, Plaintiff has shown a probability of success on its PUTSA claim

and has shown that Defendants likely acted together in that violation.

### 3.      18 U.S.C. § 1030 et seq. (Computer Fraud and Abuse Act, "CFAA")

      Plaintiff alleges that Lutz committed violations of Sections 1030(a)(2) and 1030(a)(5) of

the CFAA.  Section 1030(a)(2) prohibits unauthorized access to a computer (or access beyond

what has been authorized) in order to obtain information from a "protected computer."[4]  18 U.S.C. § 1030(a)(2).  Section 1030(a)(5) criminalizes the knowing transmission of  "a program, information, code, or command," that "intentionally causes damage without authorization to a protected computer."  Id. § 1030(a)(5).  The statute authorizes civil suits for damages and injunctive relief when a plaintiff can demonstrate, "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value[.]"  Id. §§ 1030(c)(4)(A)(i)(I), 1030(g).

Plaintiff alleges that Lutz violated Section 1030(a)(2) by accessing his work-issued computer and the sensitive data on that computer even after receiving a letter explicitly forbidding access.  Plaintiff alleges that it sustained damages in excess of $5,000, in part by needing to hire forensic computer experts to reconstruct the computer's usage history after Lutz deleted much of the computer's operating history in an effort to conceal his actions.

It appears that Lutz accessed the tower computer intentionally, with the knowledge that he was not authorized to do so, and caused Plaintiff to incur more than $5,000 in costs to reconstruct the computer as it existed before Lutz erased much of the computer's data. Therefore, the Court finds that Plaintiff has demonstrated a reasonable probability of success on the merits of its CFAA claim.

## B.    Irreparable injury

In addition to showing success on the merits, Plaintiff must also show that without the requested relief, it would suffer irreparable injury.  To establish irreparable injury, a plaintiff

---

[4] The definition of "protected computer" includes those devices at issue here, because the definition embraces any computing device that may be used in interstate commerce.  18 U.S.C. § 1030(e).

must show an impending harm that "cannot be redressed by a legal or an equitable remedy following a trial."  Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir. 1989).  Plaintiff must make a "clear showing of immediate, irreparable harm."  Cont'l Group, Inc. v. Amoco Chem. Corp., 614 F.2d 351, 359 (3d Cir. 1980) (emphasis added).  The Third Circuit, applying Pennsylvania substantive law, has made it clear that the disclosure and use of trade secrets, including presumably the type of information at stake here, may constitute irreparable harm.  See Neo Gen Screening, Inc. v. TeleChem Int'l, Inc., 69 F. App'x 550, 554 (3d Cir. 2003) (collecting cases).

Plaintiff argues that the loss of potential future customers or market share constitutes irreparable harm.  According to Plaintiff, "the use of another market actor's confidential information and trade secrets to damage its competitive position is well recognized as a cause of irreparable harm. Nextgen Healthcare Info. Sys., Inc. v. Messier, No. 05-5230, 2005 WL 3021095, at *1 (E.D. Pa. Nov. 10, 2005)."  Plaintiff's attachments show that Defendants were utilizing Plaintiff's contacts and sensitive information to erode Plaintiff's competitive position, even while two defendants remained Plaintiff's employees.  There is no reason to believe that Defendants have stopped making use of Plaintiff's protected information in the meantime.

Given Plaintiff's allegations supported by its proffered evidence, the Court is satisfied that Plaintiff has shown that without the temporary restraining order, Plaintiff will suffer irreparable injury in the form of continued encroachment on its supplier and client bases and its competitive position through the continued use of its sensitive information by Defendants.

## C.      Harm to the non-moving party and the public interest

In light of its findings above, the Court finds it unnecessary to consider the final two factors at length.  The Court finds that greater harm would come to Plaintiff if its protected information were disseminated in the absence of relief than will befall Defendants, who will suffer minor logistical inconvenience and a short delay in employment pending a formal hearing as a result of the temporary restraining order.  In addition, the Court is aware of the competing public interests between an employee's vocational freedom and an enterprise's right to be free from unfair competition.  See Bimbo Bakeries USA, Inc. v. Botticella, 613 F.3d 102, 119 (3d Cir. 2010).  But as the Third Circuit found there, the Court finds here that the public interest favors the temporary restraining order.

## III.   CONCLUSION

For the foregoing reasons, the Court will grant Plaintiff's motion for a temporary restraining order and preliminary injunction in part, and will issue a temporary restraining order pending the scheduling of a formal hearing.[5]  In keeping with Federal Rule of Civil Procedure 65(c), the Court will order Plaintiff to post a $10,000 surety "to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  See Fed. R. Civ. P. 65(c).  An order consistent with this memorandum follows.

---

[5] The temporary restraining order, detailed fully in the accompanying order, encompasses only the relief that, in the Court's view,  is necessary to avert irreparable injury.  The Court will not order, by way of example, the immediate surrender of information, documents, or devices unrelated to Plaintiff's protected information.

9